UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

BARAGA TELEPHONE CO., CHIPPEWA
COUNTY TELEPHONE CO., HIAWATHA
TELEPHONE CO., KALEVA TELEPHONE
CO., MIDWAY TELEPHONE CO.,
ONTONAGON COUNTY TELEPHONE CO.,
and PIGEON TELEPHONE CO.,

                    Plaintiffs,

v.

AMERICAN CELLULAR CORP. and DOBSON
CELLULAR SYSTEMS, INC.,

                    Defendants.
_____/

Case No. 2:05-CV-242

HON. GORDON J. QUIST

## OPINION

       Plaintiffs, Baraga Telephone Co., Chippewa County Telephone Co., Hiawatha Telephone Co., Kaleva Telephone Co., Midway Telephone Co., Ontonagon County Telephone Co., and Pigeon Telephone Co., filed a suit in the 11th Circuit Court in Alger County, Michigan, against Defendants, American Cellular Corp., and Dobson Cellular Systems, Inc., alleging four state law causes of action: breach of contract, unjust enrichment, breach of implied contract, and a request for a declaratory ruling. Defendants, pursuant to 28 U.S.C. § 1441, removed this action to federal court, claiming that diversity and federal question jurisdiction exists. Now before the Court is Plaintiffs' motion to remand this action to state court on the ground that this court lacks subject matter jurisdiction (either diversity or federal question) to entertain this suit. For the following reasons, the Court will grant Plaintiffs' motion to remand this action pursuant to 28 U.S.C. § 1447.

# I. BACKGROUND

Plaintiffs, seven local land line telephone companies, are incorporated in the State of Michigan, and their principal places of business are in Michigan.  Each Plaintiff telephone company owns and operates telecommunications facilities or networks, and provide local telephone service to customers, in geographic areas known as "exchanges."  (Pls.' Compl. at ¶¶ 8, 9.)  Thus, they are referred to as "Local Exchange Carriers," or "LECs."  *See* 47 U.S.C. § 153(26).[1]  In addition to providing telecommunications services to customers for calls made between their customers within their exchanges, Plaintiffs also use their facilities or networks to "transport and terminate" telephone calls originated by other telephone companies' customers to Plaintiffs' customers.  "Terminate" means to deliver the call to the called party.  Transport and termination services, therefore, enable customers served by one telecommunication company to complete their calls when they call customers served by another telecommunication company.  Plaintiffs, by law, are required to interconnect with other telecommunication companies and to provide transport and termination services to those companies.  *See* 47 U.S.C. § 251(c)(2) (providing that incumbent local exchange carriers have the "duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network – for the transmission and routing of telephone exchange service and exchange access); 47 C.F.R. § 20.11(a) (providing that a "local exchange carrier must provide the type of interconnection reasonably requested by a mobile service licensee or carrier . . . ").  Plaintiffs are entitled to be compensated for providing these services.  47 C.F.R. § 20.11(b)(2) ("A commercial mobile radio service provider

---

[1] Since Plaintiffs were providing local exchange services in their respective geographic service areas on the date of the enactment of the Telecommunications Act of 1996, they are also referred to as Incumbent Local Exchange Carriers, or ILECs.  *See* 47 U.S.C. § 251(h).

shall pay reasonable compensation to a local exchange carrier in connection with terminating traffic that originates on the facilities of the commercial mobile radio service provider.").

Defendants are Delaware Corporations, and their principal places of business are in Oklahoma. Defendants are cellular providers, also known as wireless carriers or Commercial Mobile Radio Service ("CMRS") providers. Defendants have customers with cellular telephones. Defendants' customers have originated calls to customers served by the Plaintiffs. Thus, Plaintiffs, in completing these calls, have provided transport and termination services to Defendants. (Pls.' Compl. at ¶ 21.)

Plaintiffs assert that, pursuant to industry custom and practice, "tariffs" are the commonly accepted basis for establishing rates and charges to be paid in exchange for transport and termination services. (*Id.* at ¶ 16.) A "tariff," as explained by Plaintiffs, "is a schedule of rates and charges that also contains terms and conditions of service and is issued by a telephone company and filed with the appropriate regulatory body." (*Id.* at ¶ 15.) Plaintiffs are members of the Michigan Exchange Carriers Association, Inc. (MECA), which, Plaintiffs maintain, "files tariffs on behalf of . . . [Plaintiffs] consistent with commonly accepted industry practice." (*Id.* at ¶ 17.) Plaintiffs maintain that they have provided transport and termination services to Defendants "consistent with the terms set forth in the controlling tariff, specifically MECA's Michigan Public Service Commission Tariff No. 24R ("Tariff No. 24R"), which has been applicable throughout the time that . . .[Plaintiffs] provided [transport and termination] services to Defendants . . . ." (*Id.* at ¶ 18.) Although Defendants have delivered their customer's wireless calls to Plaintiffs for transport and termination, Plaintiffs assert that Defendants have refused to pay for these services. (*Id.* at ¶¶ 21-23.)

Plaintiffs' complaint, filed in the 11th Circuit Court in Alger County, alleges four counts.

3

Count 1 alleges a "breach of contract/state tariff."  Plaintiffs claim that Defendants have "a legal obligation to pay" Plaintiffs "for the transport and termination of their customers' wireless calls based on the rates and charges established by Tarriff No. 24R, but failed and refused to fulfill that obligation." (*Id*. at ¶ 31.)  Count 2 alleges a claim for unjust enrichment.  (*Id*. at ¶¶ 35-39.)  Plaintiffs allege that they conferred a benefit on Defendants, Defendants accepted this benefit, but have refused to pay for it.  Count 3 alleges a claim for breach of implied contract.  (*Id*. at ¶¶ 40-42.)  Plaintiffs allege that, in directing calls to Plaintiffs to be terminated, Defendants assented to pay the rates set forth in Tariff No. 24R.  Finally, Count 4 requests a declaratory ruling that Defendants are obliged to abide by the provisions of Tariff No. 24R.  (*Id*. at ¶ 48.)  Plaintiffs allege damages in excess of $25,000.  (*Id*. at ¶ 3.)

## II. ANALYSIS

### A.  Standard of Review

"Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant."  *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429 (1987).  As a court of limited jurisdiction, this Court must proceed with caution in deciding that it has subject matter jurisdiction.  *Musson Theatrical, Inc v. Federal Express Corp.*, 89 F.3d 1244, 1252 (6th Cir. 1996).  "Due regard" must be given to the power reserved to the states under the Constitution to provide for the determination of controversies in their courts.  *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09, 61 S. Ct. 868, 872 (1941).  Removal statutes are thus strictly construed to promote comity and preserve jurisdictional boundaries between state and federal courts.  *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994).  Thus, "all doubts as to the propriety of removal are resolved in favor of remand."  *Coyne v. American Tobacco*

*Co.*, 183 F.3d 488, 493 (6th Cir. 1999).  Finally, the burden of proving the court's jurisdiction falls

on the defendant who seeks removal.  *See Rogers v. Wal-Mart Stores, Inc.,* 230 F.3d 868, 871 (6th

Cir. 2000).

## B.    Diversity Jurisdiction

Defendants first maintain that removal of this action was proper because this Court has

diversity jurisdiction to entertain this suit pursuant to 28 U.S.C. § 1332(a)(1).  This provision

provides that "district courts shall have original jurisdiction of all civil actions where the matter in

controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between

. . . citizens of different states."  It is undisputed that complete diversity of citizenship exists in this

case (Plaintiffs are all Michigan corporations with their principal places of business in Michigan, and

Defendants are Delaware corporations with their principal places of business in Oklahoma).

Plaintiffs contend, however, that the amount in controversy is not met in this case.  In their complaint

filed in state court, Plaintiffs allege only that "[t]he amount in controversy exceeds $25,000 exclusive

of costs and interests . . . ."  (Pls.' Compl. at ¶ 3.)  Each Plaintiff LEC has since filed an affidavit

claiming an amount owed from Defendants.  (Pls.' Mot. Remand Exs. 1-7.)  Each Plaintiff claims

an amount less than $75,000.[2]  If the amounts each Plaintiff LEC claims were aggregated, the

amount in controversy would exceed $75,000.

Defendants maintain that Plaintiffs' claims should be aggregated.  "The general rule is that

while separate and distinct claims may not be aggregated, aggregation is permissible when 'two or

more plaintiffs unite to enforce a single title or right in which they have a common and undivided

---

[2] The amounts claimed by the Plaintiffs are as follows: Baraga – $70,841; Chippewa – $6,085; Hiawatha – $17,561; Kaleva – $15,714; Midway – $8,143; Ontonagon – $51,405; and Pigeon – $19,828.

interest.'" *Sellers v. O'Connell*, 701 F.2d 575, 579 (6th Cir. 1983) (quoting *Snyder v. Harris*, 394 U.S. 332, 335, 89 S. Ct. 1053, 1056 (1969)). "Paradigmatic cases in which plaintiffs have a common and undivided interest, 'involve a single indivisible res, such as an estate, a piece of property (the classic example), or an insurance policy.'" *Durant v. Servicemaster Co.*, 109 F. App'x 27, 29 (6th Cir. 2004) (quoting *Gilman v. BHC Sec., Inc.,* 104 F.3d 1418, 1423 (2d Cir. 1997)).

In *Sellers*, the plaintiff filed a class action against the trustees of a pension fund, alleging that the trustees improperly reduced pension benefits to the class members pursuant to a resolution adopted by the fund trustees. *Sellers*, 701 F.2d at 576-77. The plaintiff maintained that diversity jurisdiction existed for the district court to entertain this suit. *Id*. at 578. Although diversity of citizenship existed between the parties, the plaintiff's claim for pension benefits was for less than the then $10,000 amount-in-controversy requirement. *Id.* In the attempt to meet the amount-in-controversy requirement, the plaintiff contended "that since all class plaintiffs must demonstrate the invalidity of . . . [the resolution adopted by the fund trustees], they have united to enforce the same right and are therefore entitled to aggregate their claims." *Id.* at 679. The court rejected the plaintiff's contention since the class plaintiffs did "not possess a common and undivided interest in the relief sought." *Id.* The court noted that "[a]n identifying characteristic of a common and undivided interest is that if one plaintiff cannot or does not collect his share, the shares of the remaining plaintiffs are increased." *Id*; *see Durant*, 109 F. App'x at 30 (noting that "the possibility of enhanced recovery by some plaintiffs is [a] necessary [condition] . . . for determining that plaintiffs have a common and undivided interest in a fund," and therefore are entitled to aggregate their claims). The court concluded that, "[s]uch is not the situation here because each plaintiff seeks to receive a fixed sum under the terms of the trust instrument. Where a group of plaintiffs litigate

individual cash claims the amount of which remain unaffected by the results obtained by fellow plaintiffs," the court held, "the litigants may not aggregate their claims when alleging jurisdiction." *Id*.

Defendants argue that the damages Plaintiffs' claim may be aggregated because each Plaintiff LEC seeks to enforce a single right in the application of a single joint tariff. The Court disagrees for, as in *Sellers*, the Plaintiffs here are not seeking to enforce a single title or right to which they have a common and undivided interest. Each Plaintiff LEC seeks to receive a fixed amount of money under the terms of the tariff. If one Plaintiff LEC fails to recover, the share recoverable by the remaining Plaintiffs is not increased. Thus, aggregation of Plaintiffs' claims is improper.

Defendants next assert that the amount-in-controversy requirement is met because Plaintiffs seek a declaratory ruling that Defendants have an obligation to abide by the provisions of Tariff No. 24R. In declaratory judgment actions, Defendants note, "the amount in controversy is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation." *Found. for Interior Design Educ. Research v. Savannah Coll. of Art and Design*, 39 F. Supp. 2d 889, 895 (W.D. Mich. 1998) (citations omitted). "Accordingly, the amount-in-controversy in a declaratory judgment action may be measured by 'the pecuniary result to either party which that judgment would produce.'" *Id*. (citations omitted). Defendants argue that, "[i]n the instant proceeding, the measure of the value of the association tariff is to Plaintiffs as a group (including other members of the Michigan Exchange Carriers Association which are not plaintiffs to this proceeding)." (Defs.' Resp. Opp'n Mot. Remand at 5.) Thus, Defendants conclude, "the value must be greater than the . . . damages alleged by Plaintiffs to this proceeding." (*Id*.)

First, although Defendants argue only parenthetically that a declaratory ruling that Defendants

are obligated to abide by Tariff No. 24R will benefit other members of MECA who are not plaintiffs to this proceeding, the Court notes that such a ruling would have no effect on entities not party to this lawsuit.  Moreover, the Court concludes that the value of a declaratory ruling that Defendants are obligated to abide by the provisions of Tariff No. 24R is not greater than the damages Plaintiffs claim.  If a court were to rule that Defendants were obligated to pay Plaintiffs pursuant to the tariff, then Plaintiffs would simply recover the damages alleged, which are less than the amount-in-controversy requirement necessary to establish diversity jurisdiction.[3]

Finally, Defendants maintain that, even if the Court were not to aggregate the amounts claimed by each Plaintiff LEC, the amount-in-controversy would nonetheless be met with respect to Plaintiff Baraga Telphone Co.  While Baraga alleges damages of only $70,841 (below the $75,000 threshold), it has requested attorneys' fees.  Defendants argue, quoting *Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir. 1990), that claims for attorneys' fees "can be aggregated to satisfy the jurisdictional amount required."  Since Baraga's attorneys' fees will likely exceed $4,169, Defendants assert, the amount-in-controversy threshold is met.

The Sixth Circuit's decision in *Klepper* does not support Defendants' position that this Court may aggregate a possible attorneys' fees award in favor of Baraga with Baraga's claimed damages.  In *Klepper*, the plaintiff sought $80,000 in compensatory damages for tortious interference with a

---

[3] Defendants also assert that Plaintiffs' affidavits alleging the amounts claimed "are insufficient and too vague to be considered by this Court."  Defendants claim that "[i]n determining whether the jurisdiction amount-in-controversy . . . has been met, dismissal is justified only when it appears 'to a legal certainty that the claim is really for less than the jurisdictional amount.'"  This, however, is the standard for considering the amount-in-controversy when a plaintiff originally files an action in federal court.  Where a defendant removes an action that the plaintiff filed in state court, it is the defendant's burden "to show by a preponderance of the evidence that the amount in controversy requirement has been met."  *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 572 (6th Cir. 2001).  Defendants' contention that Plaintiffs' affidavits are insufficient to demonstrate that the amount-in-controversy does not exceed the statutory threshold does aid Defendants in meeting *their* burden to establish that the amount-in-controversy *does* exceed the statutory threshold.

partnership agreement and $5,000 for attorney fees and expenses. 916 F.2d at 340. The district court granted summary judgment in favor of defendant on plaintiff's tortious interference claim. *Id*. It then dismissed plaintiff's claim for attorneys' fees, reasoning that it failed to satisfy the $10,000 amount-in-controversy requirement. *Id*. The Sixth Circuit reversed the district court's decision that it did not have jurisdiction over plaintiff's claim for attorney fees. *Id*. at 341. The court noted that since the district court had jurisdiction over the compensatory damages claim at the time the complaint was filed (which satisfied the amount-in-controversy requirement), "it also had jurisdiction over the otherwise deficient $5,000 claim for . . . attorney's fees as well." *Id*. In this case, unlike *Klepper*, Baraga's claim for compensatory damages is below the statutory threshold.

"It has long been the general rule in the United States that a prevailing party may not ordinarily recover attorneys' fees in the absence of a statute or enforceable contract providing for a fee award." *Shimman v. Int'l Union of Operating Eng'r*, 744 F.2d 1226, 1229 (6th Cir. 1984) (en banc). The amount-in-controversy, therefore, will include, in addition to the damages in dispute, attorneys' fees "if authorized by statute or contract." *Kroske v. US Bank Corp.*, 432 F.3d 976, 980 (2005). In this case, there is no statute or contract entitling Baraga to an award of attorney fees simply by being the prevailing party. Therefore, any possible award of attorneys' fees to Baraga cannot be aggregated to Baraga's claimed damages.

## C.      Federal Question Jurisdiction

Because diversity jurisdiction does not exist in this case since the amount-in-controversy is not met, Defendants must show that this Court has federal question jurisdiction over Plaintiffs' claims. "The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 2429 (1987).

9

Federal question jurisdiction arises where a "well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law," *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27-28, 103 S. Ct. 2841, 2856 (1983), in that "federal law is a necessary element of one of the well-pleaded . . . claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808, 108 S. Ct. 2166, 2173 (1988).   Under the well-pleaded complaint rule, the plaintiff is the master of his claim and can avoid federal court jurisdiction by relying exclusively on state law.   *Caterpillar*, 482 U.S. at 392, 107 S. Ct. at 2429; *see also Merrell Dow Pharm. v. Thompson*, 478 U.S. 804, 810 n.6, 106 S. Ct. 3229, 3233 (1986) (noting that "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced").

**1.      Necessary Federal Element**

From a reading of Plaintiffs' complaint, it is evident that Plaintiffs are not alleging claims created by federal law.   Rather, the claims alleged are state law claims.   Defendants argue, however, that Tariff No. 24R, which Plaintiffs allege Defendants breached, "does in fact raise federal law for its scope, jurisdiction, and authorization."   (Defs.' Resp. Opp'n Mot. Remand at 7.)   Specifically, Defendants note, Section 2.1.1(A) of the tariff provides:

> Commercial Mobile Radio Service ("CMRS") End Office Termination Service (EOTS) is available only to CMRS Providers for use in the provision of telecommunications service as specified and to the extent required by the Telecommunications Act of 1996 ("the Act") and the rules and regulations of the Federal Communications Commission and the Michigan Public Service Commission.

(Notice of Removal, Attachment A-2, CMRS End Office Termination Service General Regulations, p. 1.)   In essence, this section details the scope of Plaintiff LECs' duties to CMRS providers, such as Defendants.   In particular, it provides that Plaintiff LECs will provide transport and termination

10

services, as required by the Telecommunications Act and FCC regulations, to CMRS providers. Defendants argue that since Plaintiffs recognize "that the services offered under the Tariff . . . is [sic] controlled by the Federal Act, they have in fact asserted a Federal issue in their complaint, and federal question jurisdiction and removal to this Court is proper." (Defs' Resp. Opp'n Mot. Remand at 8.)

While not cited by Defendants, it appears that, in maintaining that Plaintiffs have asserted a federal issue in their complaint, Defendants are relying upon the *Smith-Merrell Dow-Grable & Sons* line of cases, which provide that federal question jurisdiction will lie over a state-law claim where the "claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Products v. Darue Engineering & Manufacturing*, 545 U.S. 308, 125 S. Ct. 2363, 2368 (2005); *Merrell Dow*, 478 U.S. at 808, 106 S. Ct. at 3232 ("We have . . . noted that a case may arise under federal law 'where the vindication of a right under state law necessarily turned on some construction of federal law.'") The classic example of this type of case, the Court noted recently, is *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S. Ct. 243 (1921), "a suit by a shareholder claiming that the defendant corporation could not lawfully buy certain bonds of the National Government because their issuance was unconstitutional." *Grable & Sons*, 545 U.S. 308, 125 S. Ct. at 2367. "Although Missouri law provided the cause of action, the Court recognized federal-question jurisdiction because the principal issue in the case," which was raised in the plaintiff's complaint, "was the federal constitutionality of the bond issue." *Id.*

In *Grable & Sons*, the plaintiff filed a quiet title action in Michigan state court alleging that

the defendant's title to certain property was invalid.  545 U.S. 308, 125 S. Ct. at 2366.  A Michigan

court rule required the complaint to specify "the facts establishing the superiority of [its] claims,"

and plaintiff "premised its superior title claim on a failure by the IRS to give it adequate notice, as

defined by federal law."  *Id*. at 2368.  Whether the plaintiff "was given notice within the meaning

of a the federal statute," the Court recognized, was "thus an essential element of its quiet title claim,

and the meaning of the federal statute [was] actually in dispute . . . ."  *Id*.  In finding federal question

jurisdiction, the Court observed that the meaning of the federal tax provision was an important issue

of federal law that belonged in federal court, especially in light of the Government's interest in the

"'prompt and certain collection of delinquent taxes,'" and the IRS' need for certainty in notice

requirements to provide buyers of seized property assurance that the IRS has taken all steps required

to convey good title.  *Id*. (quoting *United States v. Rodgers*, 461 U.S. 677, 709, 103 S. Ct. 2132,

2135 (1983)).

　　　In this case, unlike *Smith* and *Grable & Sons*, Plaintiffs' right to relief, without reference to

any possible defense, does not necessarily depend upon the resolution of a substantial and disputed

question of federal law.  For Plaintiffs to obtain their requested relief (again, without reference to

any possible defense), Plaintiffs need only prove, consistent with their allegations, that they provided

Defendants a valuable service in accordance with a state tariff that required Defendants to pay for

the services rendered and that, in breach of this obligation, Defendants failed to pay.  The fact that

the state tariff references federal law does not indicate that a substantial and disputed question of

federal law is an essential element of Plaintiffs' right to relief.  Indeed, in referring to federal law,

the tariff simply provides that Plaintiff LECs are required to provide transport and termination

services to CMRS providers, such as Defendants.  Unlike *Grable & Sons*, where the sole disputed

issue involved the interpretation of a federal statute, there is absolutely no dispute that Plaintiff LECs are required to provide termination services to CMRS providers. Simply because federal law provides the framework in which a contractual relationship is established does not by itself make federal law a necessary element of a claim arising out of that contractual relationship. *See Precision Pay Phones v. Qwest Communications Corp.*, 210 F. Supp. 2d 1106, 1118 (N.D. Cal. 2002) (noting that "[j]ust as the creation [of] property rights through federal land patents, trademarks and copyrights has been held not to transform state law actions to enforce contract and property rights into federal claims," the Telecommunications Act's requirement that an interexchange carrier ("IXC") compensate a payphone service provider ("PSP") for completed calls using the PSP's payphones did not transform a PSP's quantum meruit claim against an IXC into a federal claim); *see also Empire Healthchoice Assurance, Inc. v. McVeigh*, — S. Ct. —, 2006 WL 1639763 (June 15, 2006) (concluding that a suit brought by a health insurance carrier against one of its insureds, pursuant to a provision in a Federal Employee Health Benefits Act (FEHBA) authorized, Office of Personal Management (OPM) negotiated, health benefits contract, that entitled the insurer to reimbursement for health benefits rendered to the insured after the insured recovered damages in a tort action brought in state court, did not fit into "the slim category [of cases] *Grable* exemplifies").

Moreover, even if federal law were a necessary and disputed element of one of Plaintiffs' claims, it is illogical to conclude that federal question jurisdiction exists where a plaintiff fails to allege a federal issue, the resolution of which is necessary for the plaintiff to succeed on its claims, since the plaintiff should have alleged the federal issue. Rather, in such a case, the plaintiff's claim would simply fail. For instance, in *Smith* and in *Grable & Sons*, the plaintiffs affirmatively alleged, as part of their state law claims, that federal law entitled them to relief. If the plaintiffs in those cases

13

had failed to allege the federal issues, the courts would not have found federal jurisdiction on the ground that the plaintiffs should have alleged the federal issues; rather, their claims would simply have failed.

## 2.    Complete Preemption

The Supreme Court has explained that "the 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S. Ct. 1542, 1546 (1987). "Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore does not authorize removal to federal court." *Id*. "One corollary of the well-pleaded complaint rule," the Supreme Court has explained, "is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Id*. Complete preemption applies where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393, 107 S. Ct. at 2430 (quoting *Metro. Life*, 481 U.S. at 65, 107 S. Ct. at 1547). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id*. To date, the Supreme Court has recognized complete preemption under only three statutes: § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185; § 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B); and § 30 of the National Bank Act, 12 U.S.C. §§ 85 & 86.

"Complete preemption that supports removal and ordinary preemption are two distinct

14

concepts." *Roddy v. Grand Trunk W. R.R. Inc.*, 395 F.3d 318, 323 (6th Cir. 2005). "The fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted under [a federal statute] does not establish that they are removable to federal court." *Caterpillar*, 482 U.S. at 398, 107 S. Ct. at 2432. "Rather, it is only when the federal statutory language demonstrates that Congress has manifested a clear intent that claims not only be preempted under the federal law, but also that they be removable, that they are deemed to be 'completely preempted.'" *Palkow v. CSX Transp.*, 431 F.3d 543, 553 (6th Cir. 2005). "What must be made clear," the Sixth Circuit has explained, "is that 'complete preemption' – no matter how powerful when properly present in a case – is of very limited application: it is a very limited exception to the well-pleaded complaint rule." *Id*. Indeed, "[i]n the absence of explicit direction from Congress, the Supreme Court has stated that it would be reluctant to find the extraordinary preemptive power that converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Roddy*, 395 F.3d at 323 (citing *Metro. Life*, 481 U.S. at 64-65, 107 S. Ct. at 1547).

Defendants argument, on the merits, relying principally upon *Verizon North v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002), is that Plaintiffs' claims for compensation pursuant to Tariff No. 24R is preempted by §§ 251 and 252 of the Telecommunications Act of 1996, which provides, in Defendants' opinion, that for an LEC to be compensated for providing termination services to a CMRS provider, it may not rely upon a state tariff, but must instead enter into a reciprocal compensation agreement with the CMRS provider. Defendants recognize, however, that this preemption argument, as a defense, does not appear on a well-pleaded complaint and thus does not grant this Court jurisdiction pursuant to § 1331. (Defs.' Resp. Opp'n Mot. Remand at 8 (noting that Plaintiffs failed to mention in their complaint that *Strand* preempts their claims but instead rely upon

15

the well-pleaded complaint rule to avoid federal jurisdiction over their complaint.))  Thus, Defendants argue, not only does federal law preempt Plaintiffs' claims for recovery pursuant to a state tariff, but Plaintiffs' claims are, in fact, completely preempted by federal law such that, although they are couched as state law claims, they are, and only can be, federal law claims.  In Defendants' opinion, a state law claim is completely preempted where Congress has created a parallel federal cause of action that converts the state claim into a federal claim for purposes of the well-pleaded complaint rule.  (Defs.' Resp. Opp'n Mot. Remand at 9.)  Defendants maintain that §§ 251(b)(5) and 252(d)(2) establish a federal cause of action for "compensation for transport and termination [services]."  (*Id.*)

The Court concludes that Plaintiffs' state law claims are not completely preempted by the Act such that Plaintiffs' claims could only have been brought in federal court.  First, the statutes cited by Defendants do not necessarily establish a specific cause of action for recovery of termination fees.  Section 251(b)(5) simply provides that an LEC has the "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  Section 252(d)(2) provides the standards that a state commission must apply in determining whether the compensation for transport and termination services provided for in an interconnection agreement are just and reasonable.  In contrast, ERISA provides a specific civil enforcement provision.  Section 502(a)(1)(B) of ERISA provides that a participant or beneficiary may bring a civil action to recover benefits due him under the terms of an employee benefit plan.[4]  Moreover, unlike either ERISA or

---

[4] Section 206 of the Act provides that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this Act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained . . . ."  Even if this section were construed as providing Plaintiffs' a specific cause of action to recover compensation for the transport and termination services provided to Defendants, the Court would nonetheless conclude that, in light of the doctrine's narrow application, the Act's savings clause, and the absence of any clear

the LMRA, the Federal Communications Act, as amended by the Telecommunications Act, contains a savings clause, which provides that "[n]othing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies." 47 U.S.C. § 414. Given the narrow scope of the complete preemption doctrine, the absence of a specific cause of action entitling a telecommunications company to recover compensation for termination services, and the existence of a savings clause in the Act, the Court concludes that there is no indication that Congress intended to completely preempt a state law breach of contract action for failure to pay compensation for termination services. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d Cir. 1998) (finding no complete preemption under the Act); *Bryceland v. AT&T Corp.*, 122 F. Supp. 2d 703, 710 (N.D. Tex. 2000) (noting that the Act's saving clause evidences that Congress did not intend to completely preempt claims arising under the Act); *Braco v. MCI Worldcom Comm. Inc.*, 138 F. Supp. 2d 1260, 1269 (C.D. Cal. 2001) ("The Court joins this weight of authority, and finds that the [Act], even if it may 'preempt' some or all of Plaintiff's claims, does not 'completely preempt' those claims so as to confer an adequate basis for removal to federal court.").

Finally, while Defendants, in the "background and facts" section of their brief, claim that the state tariff Plaintiffs seek to enforce "is completely preempted by Federal law, since it," quoting *Strand*, 309 F.3d at 940, "'completely bypasses and ignores the detailed process for interconnection set out by Congress in the [Act],'" Defendants do not argue that *Strand* provides that Plaintiffs' state law causes of actions are completely preempted by federal law. (*See* Defs.' Resp. Opp'n Mot.

---

Congressional indication evidencing its intent to completely preempt these claims, that Plaintiffs' state law claims are not completely preempted by the Act.

Remand at 8.)  If Defendants had argued that *Strand*, 309 F.3d 935, provides that Plaintiffs' claims are completely preempted, this argument would have failed.  In *Strand*, Verizon sued the Michigan Public Service Commission alleging that the Commission's order requiring it to offer services to competitors through published tariffs at rates predetermined by the Commission was preempted by federal law.  *Id.* at 937, 939.  The court agreed with Verizon, holding that since the Commission's order was "inconsistent with the provisions of the FTA" establishing the "process for interconnection" between an incumbent and a competitor, the order was "therefore preempted."  *Id.* at 941.

The issue in *Strand* was one of ordinary preemption, not complete preemption.  As explained above, "[c]omplete preemption that supports removal and ordinary preemption are two distinct concepts."  *Roddy v. Grand Trunk W. R.R. Inc.*, 395 F.3d 318, 323 (6th Cir. 2005).  "The fact that a defendant might ultimately prove that a plaintiff's claims are pre-empted under [a federal statute] does not establish that they are removable to federal court."  *Caterpillar*, 482 U.S. at 398, 107 S. Ct. at 2432.  In *Strand*, the issue of the federal court's jurisdiction was not in dispute, as the plaintiff filed its action in federal court alleging that federal law entitled it to relief.  In this case, in contrast, Plaintiffs filed state law causes of action in state court.  While principles of ordinary preemption may preclude Plaintiffs from their requested relief, that does not establish that Plaintiffs' claims are removable to federal court through complete preemption, for there is no indication in the Act that congress intended Plaintiffs' claims to lie solely in federal court.

**3.     "Artful Pleading"**

Finally, Defendants maintain that Plaintiffs have "artfully pled" to disguise their federal claims as state claims.  As noted above, under the well-pleaded complaint rule, the plaintiff is the

18

master of his claim and can avoid federal court jurisdiction by relying exclusively on state law. *Caterpillar*, 482 U.S. at 392, 107 S. Ct. at 2429; *see also Merrell Dow Pharm. v. Thompson*, 478 U.S. 804, 810 n.6, 106 S. Ct. 3229, 3233 n.6 (1986) (noting that "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced"). The issue is, therefore, not whether Plaintiffs could have relied upon federal law in maintaining their claims for compensation for the transport and termination services provided to Defendants, but whether Plaintiffs must have relied upon federal law in maintaining these claims because Plaintiffs' state law claims are completely preempted. Thus, Defendants' argument that Plaintiffs have artfully disguised their federal claims as state claims is a reiteration of their argument that Plaintiffs' claims are completely preempted. *See Braco*, 138 F. Supp. 2d at 1268 n.10 (noting that a finding of complete preemption is a prerequisite to a "finding that a plaintiff has 'pled around' what would otherwise be a federal claim"). Indeed, the case relied upon by Defendants in asserting that Plaintiffs have artfully failed to plead a federal cause of action evidences that Defendants are, in essence, re-asserting that Plaintiffs' state law claims are completely preempted.

In *Solomon v. MCI Telecommunications* (*In re Long Distance Telecommunications Litigation*), 640 F. Supp. 997 (E.D. Mich. 1986), the plaintiff filed an action against the defendants in state court alleging that the defendants, in breach of a contract between the parties, charged him for calls that were not "completed by an answer at the number called." *Id.* at 998. The plaintiff further alleged that the defendants fraudulently concealed this charging practice, which resulted in their unjust enrichment. *Id.* The defendants removed the case to federal court on the basis of federal question jurisdiction and the plaintiff moved to remand the action to state court. *Id.* at 998-99. In denying the plaintiff's motion to remand, the district court concluded that Congress intended to

occupy the interstate telecommunications field.  *Id.* at 1000.  In reaching this conclusion, the court

relied upon the Second Circuit's decision in *Ivy Broadcasting Co. v. AT&T Co.*, 391 F.2d 486, 491

(2d Cir. 1968), which provided that "questions  concerning the duties, charges, and liabilities of

telegraph or telephone companies with respect to an interstate communications service are to be

governed solely by federal law and that the states are precluded from acting in this area . . . ."

The district court's opinion in *Solomon* does not persuade the Court that Plaintiffs' state law

claims are completely preempted.  In *Nordlicht v. New York Telephone Co.*, 799 F.2d 859 (2d Cir.

1986), the Second Circuit, following its earlier decision in *Ivy Broadcasting* (which was relied upon

by the district court in *Solomon*), held that the class action plaintiffs' state law fraud claim

challenging the fraudulent billing practices of a carrier was removable to federal court under the

doctrine of complete preemption based upon the preemptive force of federal common law in the area

of interstate telecommunications.  799 F.2d at 862.  In *Marcus v. AT&T Corp.*, 138 F.3d 46, 54 (2d

Cir. 1998), the court, after recognizing *Nordlicht*'s holding, explained:

> Subsequent to *Nordlicht*, however, the Supreme Court decided *Metropolitan Life*
> . . . , in which the Court sharply circumscribed the availability of removal based on
> complete preemption.  Specifically, the Court held that the doctrine applies only in
> the very narrow range of cases where 'Congress has clearly manifested an intent' to
> make a specific action within a particular area removable. . . . Justice Brennan
> cautioned in his concurrence in *Metropolitan Life* . . . [that i]n future cases involving
> other statues, the prudent course for a federal court that does not find a clear
> congressional intent to create removal jurisdiction will be to remand the case to state
> court.

138 F.3d at 54 (citations omitted).  "After *Metropolitan Life*," the court opined, "it would be

disingenuous to maintain that, while the FCA does not preempt state law claims directly, it manages

to do so indirectly under the guise of federal common law."  *Id.*  "In sum," the *Marcus* court

concluded, to the extent *Nordlicht* provides that state law claims against telecommunications'

carriers for fraudulent billing practices are completely preempted by federal law, "it is no longer the law after *Metropolitan Life*." *Id*. Not only does the fact that *Solomon* was decided before the Supreme Court's decision in *Metropolitan Life* persuades the Court that *Solomon* does not support a finding of complete preemption, but the *Solomon* decision is also suspect for it fails to even mention the Communication Act's savings clause, which provides that "[n]othing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."[5]  47 U.S.C. § 414.

While it is evident that the Federal Communications Act, as amended by the Telecommunications Act of 1996, does not completely preempt all state law causes of action that could have been brought under the Act (if the plaintiff had so chosen), courts have held that a specific cause of action brought under the Act is completely preempted.  In *Cahnmann v. Sprint Corp*., 133 F.3d 484 (7th Cir. 1998), the plaintiff brought a class action against Sprint in state court alleging a breach of contract.  "In January 1996, Sprint . . . filed with the FCC a tariff setting forth the terms of a new service intended to attract long-distance customers to Sprint . . . .  The tariff offered, to small businesses that agreed to subscribe to Sprint for a minimum of $50 in long-distance

---

[5] In *Solomon*, the district court opined that the "Supreme Court recognized the Congressional intent to occupy the field of interstate communications in . . . *Benanti v. United States*, 355 U.S. 96, 104, 78 S. Ct. 155 (1957)."  In *Benanti*, the issue before the Supreme Court was "whether evidence obtained as the result of wire tapping by state law enforcement officers, even though without participation by federal authorities, was inadmissible in federal court."  *Id*. at 97, 78 S. Ct. at 156.  At the time, § 605 of the Federal Communications Act provided "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . . ."  In arguing that the state officers' violation of this section did not mandate the suppression of the evidence, the government noted that the officers had placed the wiretap in accordance with New York law.  *Id*. at 103, 78 S. Ct. at 159.  The Court rejected this argument, opining that "had Congress intended to allow the States to make exceptions to Section 605, it would have said so."  *Id*. at 105, 78 S. Ct. at 160.  Moreover, the Court continued, "[i]n light of the . . . comprehensive scheme of interstate regulation and the public policy underlying Section 605 as part of that scheme, we find that Congress, setting out a prohibition in plain terms, did not mean to allow state legislation which would contradict that section and that policy."  Finding that Congress did not intend to permit state legislation to stand that contradicted § 605 does not support the conclusion that any state law cause of action that could have been brought under the act therefore *must* be brought under the act.

21

calls per month, up to $1,000 worth per month of free long-distance calls on Fridays to *anywhere in the world for one year*." *Id*. at 486. "Four months later, Sprint amended the tariff to delete ten countries . . . from the offer of free Friday calling . . . ." *Id*. "The class members . . . [were] 'Fridays Free' customers who . . . [were] paying more, on balance, than they would have had to pay had the original tariff remained in force." *Id*. Sprint removed this action to federal court and the plaintiff moved to remand.

In considering whether federal question jurisdiction existed over the plaintiff's state law claims, the court first explained that the "terms and conditions" for long-distance telephone service "are set forth in 'tariffs,' which are essentially offers to sell on specified terms, filed with the FCC and subject to modification or disapproval by it. Once a tariff is filed and until it is amended, modified, superseded, or disapproved," the court continued, "the carrier may not deviate from its terms." *Id*. at 487. "What this means," the court explained, "is that the filed tariff is the contract between the plaintiff . . . and Sprint." *Id*. The plaintiff maintained that the first tariff filed with the FCC (the one that included all the countries in the world in its "Free Fridays" plan) was the contract between her and Sprint. *Id*. "If Sprint violated the tariff to her detriment," the court noted, she would have been entitled to proceed against Sprint under federal law. *Id*. "The issue is," the court recognized, "whether her federal remedy is exclusive or whether she can instead seek relief under state contract law. *Id*. at 488. The court concluded that the "Act extinguishes the right to bring a suit for breach of contract under state law when the effect of that suit would be to challenge a tariff." *Id*. In reaching this conclusion, the court first recalled that "Sprint's tariff (either in its original form or as amended) . . . [was] the contract." *Id*. "Any rights that the plaintiff [had] to complain about a breach of contract [were] rights granted to her by the original tariff . . . ." *Id*. "A tariff filed with a

federal agency," the court explained, "is the equivalent of a federal regulation, and so a suit to enforce it, and even more clearly a suit to invalidate it as unreasonable under federal law . . . arise[s] under federal law."  *Id.*  "[S]ince the federal regulation defines the entire contractual relationship between the parties," the court concluded, "there is no contractual undertaking left over that state law might enforce.  Federal law does not merely create a right; it occupies the whole field, displacing state law."  *Id.*

In interpreting *Cahnmann,* courts have concluded that it does not stand for the proposition that every state law claim for a breach of contract arising out of a relationship with a telecommunications carrier is completely preempted by federal law.  *See Marcus*, 138 F.3d at 55; *Saap v. AT&T Corp.*, 215 F. Supp. 2d 1273, 1276 (M.D. Ala. 2002).  Rather, courts have interpreted, and followed, *Cahnmann*, as providing that the Federal Communications Act "extinguishes the right to bring a suit for breach of contract under state law when the effect of the suit would be to challenge a tariff [filed with the FCC]."  *Saap*, 215 F. Supp at 1276 (quoting *Cahnmann*, 133 F.3d at 488); *Marcus*, 138 F.3d at 55-56 (denying plaintiffs' motion to remand because plaintiffs' breach of warranty claim necessarily arose out of federal law since the only contract between the plaintiffs and the defendant was a tariff filed with the FCC); *Bryan v. Bellsouth Commc'n. Inc.,* 377 F.3d 424, 430-31 (4th Cir. 2004) (holding that a plaintiff's unfair practices action against defendant claiming that defendant charged an excessive federal universal service fee challenged a filed tariff and therefore arose only out of federal law).

Where a plaintiff's breach of contract claim is not based on a federal tariff, however, courts have held that the plaintiff's claim is not completely preempted by federal law.  *See Fax Telecomm. v. AT&T*, 138 F.3d 479, 487 (2d Cir. 1998) ("In the present action, Fax's breach of contract claim

is based on an alleged contract . . . that is independent of the rate on file with the FCC.  Whether or not this contract exists or is enforceable, it is not the filed rate and therefore is not a simple creature of federal law.").  In this case, Plaintiffs' breach of contract claim is not based on a tariff filed with the FCC.  Rather, it is based on a state tariff.  Therefore, a federal tariff (which is, in essence a federal regulation) does not define the entire contractual relationship between the parties "such that there is no contractual undertaking left over that state law might enforce." *Cahnmann*, 133 F.3d at 488.

While Plaintiffs likely could have brought this action for compensation for the transport and termination services provided to Defendants in federal court, there is no indication in the statute that reliance on federal law is the only avenue open to Plaintiffs to recover compensation for the services provided.  The decision in *Precision Pay Phones v. Qwest Communications Corp.*, 210 F. Supp. 2d 1106 (N.D. Cal. 2002) is instructive.  In *Precision*, the plaintiff, a "payphone service provider" filed a quantum meruit claim against Qwest, an "interexchange carrier," in state court for compensation for calls completed by Qwest using plaintiff's payphones.  Section 276 of the Telecommunications Act of 1996 "provided for establishment by the . . . [FCC] of 'a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphones.'"  *Id*. at 1109 (quoting 47 U.S.C. § 276(b)(1)(A)).  Qwest removed the case to federal court on the basis of federal question jurisdiction and plaintiff moved to remand.  In considering whether the court had federal question jurisdiction to entertain the suit, the court first concluded that, in its opinion, the Act provided plaintiff "a private right of action to compel the payment of . . . compensation . . . ."  *Id*. at 1113.  However, the court concluded, "while . . . § 276(b)(1)(A) of the Telecommunications Act may be enforced by a suit in federal court, there

24

is nothing to suggest Congress intended this mode of enforcement to be to the exclusion of claims in state court." *Id.* at 1117. Similarly, here, while Plaintiffs likely could have brought a claim in federal court to recover compensation from Defendants for the transport and termination services provided to them, "there is nothing [in the Act] to suggest Congress intended this mode of enforcement to be to the exclusion of claims in state court."

Although this Court concludes that Defendants have not met their burden to show that Plaintiffs' complaint, on its face, establishes that this Court has federal question jurisdiction pursuant to § 1331 to entertain this suit, the Court recognizes that, ultimately, this case will be decided upon an issue of federal law. Specifically, in response to Plaintiffs' complaint, Defendants will argue that the state tariff relied upon by Plaintiffs is unenforceable due to or preempted by §§ 251 and 252 of the FTA. Defendants will argue that, for Plaintiffs to recover payment for termination services, they must enter into a reciprocal compensation agreement with Defendants. Defendants will assert that the filing of a state tariff to set the terms for compensation for termination services is inconsistent with the Act. Plaintiffs will respond that the Act did not permit them to make the initial request for interconnection from a CMRS provider and to invoke the procedures set forth in § 252 of the Act. Recognizing this, Plaintiffs will point out, the FCC ruled that, in the absence of an interconnection agreement, a CMRS provider accepts the terms of otherwise applicable state tariffs when it routes traffic to LECs. *In the Matter of Developing a Unified Intercarrier Compensation Regime* (*T-Mobile*)*, 2005 WL 433200, *4, 20 FCC Rcd. 4855, 4859. Defendants, then, will argue that the FCC's decision in *T-Mobile* is not entitled to *Chevron* deference and is incorrect.

As the Court explained in *Franchise Tax Board*, however, while the allegations in a case may "show that very likely, in the course of the litigation, a question under the [law of the United States]

would arise," "[f]or better or worse, under the present statutory scheme as it has existed since 1887, a defendant may not remove a case to federal court unless the *plaintiff's* complaint establishes that the case 'arises under' federal law." *Franchise Tax Bd.*, 463 U.S. at 10, 103 S. Ct. at 2846-47.

## III.  CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' motion to remand (docket no. 16) pursuant to 28 U.S.C. § 1447.

An order consistent with this opinion will be entered.

Dated:  July 12, 2006                            _____/s/ Gordon J. Quist_____
                                                 GORDON J. QUIST
                                                 UNITED STATES DISTRICT JUDGE